409 P.2d 730

**Fred R. HURLEY, Randall Barton, and Thunderbird Transfer & Storage Co., Appellants,**

v.

**Frederick E. KALLOF, dba Real Estate Syndications, Appellee.***
**No. 1 CA–CIV 77.**

Court of Appeals of Arizona.
Jan. 10, 1966.
Rehearing Denied Feb. 4, 1966.

---

* This appeal was filed with the Arizona Supreme Court and assigned that Court's Number 8078. The matter was referred to this Court pursuant to Section 12–120.23 A.R.S.

suit against the defendants, Fred R. Hurley, Randall Barton and Thunderbird Transfer and Storage Company, for a commission allegedly due on the sale of real property. Hurley and Barton were the sole stockholders of Thunderbird Transfer and Storage Company. The matter was tried to the court without a jury, and from a judgment in favor of the plaintiff, the defendants appeal.

We are called upon to decide two questions: (1) whether the plaintiff was the efficient, procuring cause of the sale of Thunderbird Transfer to H. T. Luther, and therefore entitled to a commission for said sale, and (2) whether under the facts in this case there was a duty on the part of the defendants to remain neutral among rival brokers, and if such a duty, did the defendants breach that duty.

The facts necessary for a determination of this matter on appeal are as follows: On 2 May, 1960, the defendant Hurley, President of Thunderbird Transfer and Storage Company, gave Scarborough-Miller Company, realtors, an open listing for the sale of the business at a suggested price of $70,000.

At this time, Taft Kallof, a salesman for Real Estate Syndications, had been representing several potential buyers of transfer companies or property. Taft Kallof learned of the availability of Thunderbird Transfer and contacted Hurley concerning the sale of the property. By letter dated 30 June, 1960, Kallof wrote to Luther of El Paso, Texas, telling him the asking price for Thunderbird Transfer and enclosing with the letter financial data of the Thunderbird operation. The letter indicated a sales price of $75,000. On 5 July, 1960, Taft Kallof obtained from Hurley an open listing to sell the transfer company for $75,000. On 11 July, 1960, Luther stated in reply to Kallof's letter:

> "I do not think we would be interested in the purchase of this company at their quoted price. If they would care to quote any other figure, we would be glad to receive same and give it due

Gust, Rosenfeld & Divelbess, by Frank E. Flynn and Richard H. Segal, Phoenix, for appellants.

Frederick E. Kallof and Louis P. Ferrara, by Frederick E. Kallof, Phoenix, for appellee.

CAMERON, Judge.

Plaintiff, Frederick E. Kallof, doing business as Real Estate Syndications, brought a

consideration. I might add that we would not want to assume any lease."

This letter was the last correspondence between Luther and Kallof prior to the sale of Thunderbird.

On 27 July, 1960, Luther sent a letter to Scarborough-Miller Company, realtors, with an attached copy of an advertisement which had been clipped from the Dallas, Texas, edition of the Wall Street Journal. The advertisement placed by Scarborough-Miller stated there was an Arizona truck line for sale at $70,000. There was no mention in the advertisement that the truck line was Thunderbird Transfer and Storage. Scarborough-Miller answered Luther's inquiry on 29 July, with general information, and there followed a series of letters between Luther and Scarborough-Miller concerning the possible purchase of the property by Luther. Negotiations were terminated on 29 August, 1960, when Scarborough-Miller wrote to Luther informing him that Thunderbird Transfer and Storage had been sold (to Harris), and telling him that another truck and transfer operation might be available in the near future. Luther replied on 2 September, 1960, explaining why he did not act quickly on the Thunderbird company. He expressed interest in purchasing an operation in Phoenix, and asked for particulars on the other company which Scarborough-Miller had mentioned. It was the testimony of Taft Kallof that Hurley knew of the efforts of Kallof to interest Luther and that pending the attempted sale to Harris, Kallof was to do nothing. As stated by Taft Kallof:

> "Well, this is the way Hurley and I left it; that we were going to be in touch with each other, and he was going to let me know if the possible sale to Harris would go through."

This is, of course, controverted by Hurley.

The sale to Harris was not consummated, and on 26 September, 1960, Scarborough-Miller again wrote to Luther informing him of that fact and asking if he was still interested in the Thunderbird company. On 4 October, 1960, Hurley, on behalf of

Thunderbird Transfer, authorized Scarborough-Miller to make two alternative proposals to Luther. On 25 October, 1960, Hurley and Luther entered into an agreement for the sale of all assets of Thunderbird Transfer for $45,000 (an amount less than the 4 October asking price).

Prior to the sale, on 21 October, 1960, Taft Kallof, having learned of the impending sale to Luther, notified the defendants by letter that the plaintiff expected a commission on any sale to Luther. The letter read in part as follows:

> "Pursuant to the authority granted to me by the listing agreement given by you, I proceeded to contact and open negotiations with Luther Transfer and Storage for the purchase of your business, equipment and leasehold and I give you notice of this, which notice is undisputed and acknowledged. Also Luther has received information concerning your company by telephone and correspondence."

After the sale, plaintiff brought suit against the defendants for a commission on the sale.

Both sides cite the case of Fink v. Williamson, 62 Ariz. 379, 158 P.2d 159 (1945) as being controlling, and a look at that case is necessary before we discuss the case at bar. In Fink v. Williamson, the plaintiff, a real estate broker, showed the property in question to the eventual buyer. The plaintiff notified the sellers of the buyer's interest by name, received an authorization to sell the property for $32,000 and communicated said offer to the buyers. The buyers, after these negotiations, then went to a second broker and started negotiations for the purchase of the property through the second broker. Negotiations through the second broker were consummated by the signing of a preliminary agreement for the sale of this property at a lesser price eleven days later. During this time the plaintiff continued negotiating with the potential buyers. After the plaintiff had heard that the property had been sold to

the buyer in question, he then demanded a commission, and the Arizona Supreme Court upheld the right of the plaintiff to a commission. The Supreme Court reasoned that before the plaintiff would be entitled to a commission he would have to be the efficient, proximate, and procuring cause of the sale. The Court then found:

"In the case at bar the plaintiff and not the agent who consummated the deal, was the procuring cause." Fink v. Williamson, 62 Ariz. at 385, 158 P.2d at 162.

The later Arizona Supreme Court cases have reinforced the decision of Fink v. Williamson:

"The term 'procuring cause' as used in describing a broker's activity, refers to a cause originating a series of events which, without break in their continuity, result in accomplishment of the prime objective of employment of the broker — producing a purchaser ready, willing and able to buy real estate on the owner's terms." Clark v. Ellsworth, 66 Ariz. 119 at 122, 184 P.2d 821, at 822 (1947).

And:

"According to the general rule which we have adopted governing cases of this kind, if the plaintiff was the procuring cause of the sale he is entitled to the commission." Porter v. Ploughe, 77 Ariz. 33 at 36, 266 P.2d 749, at 751 (1954).

Applying these cases to the facts at bar, we believe that Taft Kallof may not be considered the procuring cause of the sale of this property. It is true that he first contacted Luther by mail, notifying him, though not by name, of the Thunderbird Transfer property. It is equally true, however, that Luther was not interested in continuing negotiations with Taft Kallof on the terms indicated in Kallof's letter. Luther wrote what appeared to be a letter terminating negotiations, and Kallof let the matter drop at that point. Scarborough-Miller on the other hand, placed an advertisement in the southwestern edition of the Wall Street Journal and Luther responded to that ad. The difference between the services performed by Taft Kallof and Scarborough-Miller is that Scarborough-Miller kept the lines of communication open with Luther, even after it appeared that the transfer company had been sold to another party. We do not believe that Fink v. Williamson, supra, can be extended to cover a situation which would allow a salesman, on the showing here made of his contacts with a potential client, to sit back and wait while other more efficient and more aggressive salesmen consummate the sale and then demand for himself a real estate commission. On the facts before us, it is our opinion, and we therefore hold, that the plaintiff Kallof was not the efficient, procuring cause of the sale.

Even if we assume that Luther, and Hurley of Thunderbird, had been brought together and discussed the sale at the outset, there is respectable authority that to be entitled to a commission the first broker must do more than merely introduce the parties:

"The simple meaning of this is that where agency to sell is given to more than one, a first approach and negotiation does not earmark a prospect as the exclusive customer of the introducing broker. By listing property for sale with others, each broker is warned that he is operating in a competitive field and in the absence of fraud or collusion to the victor will belong the spoils and whatever effort the loser has put into the race is lost to him." Reed v. Taylor, 78 Wyo. 216, 322 P.2d 147, 151 (1958).

It is further contended by plaintiffs that the defendants had a duty to remain neutral as between the two different brokers (Kallof and Scarborough-Miller) and that by reducing the price to Scarborough-Miller without informing Taft Kallof, the defendant breached that duty. The requirement that under certain circumstances the seller must remain neutral as between two com-

peting brokers has been stated in Fink v. Williamson, supra:

"The owner of property, listing it for sale with different brokers, cannot reduce the selling price to one and not the other provided the brokers are showing the property to the same customer. The seller must remain neutral to rival brokers. * * * It will be seen from the foregoing authorities that where an owner employs different brokers he must not only be neutral as between the brokers, but if a purchaser is introduced to him by one broker, and the negotiations through that broker have not fallen through, the owner may not, with the knowledge of the facts, sell to such purchaser through another agent to the exclusion of the first agent. If the owner completes the deal through another agent under these circumstances, the owner is liable to the first agent." Fink v. Williamson, 62 Ariz. at 385, 386, 158 P.2d at 162.

We feel that Fink v. Williamson, supra, cannot be expanded to include the facts in this case. By the time Scarborough-Miller received the letter from Luther, negotiations had been terminated between Taft Kallof and Luther. It is the rule rather than the exception, that once a prospect has become interested in purchasing a piece of real property that extended negotiations will be conducted between the buyer and seller, either through or with the assistance of a broker. To require the seller to inform other brokers of each and every turn in the negotiations would not be in accord with everyday business procedures. Fink v. Williamson, supra, is limited to those situations where a seller is knowingly negotiating with the same buyer through two different brokers. In those instances, the seller, knowingly encouraging two different brokers to expend their time and effort on the same prospect, is charged with a duty of fair dealing and neutrality. This does not mean that a seller who has allowed his property to be listed by more than one broker under so-called "open listings" has a duty to keep all brokers informed of any counter-offers made by the seller in negotiating the sale, or for that matter, requiring the seller to list the property for the same price with each broker.

Taft Kallof had the same opportunity that Scarborough-Miller had to keep the channels of communication open between himself and Luther. But Kallof failed to do so. At the time that Hurley decided to lower his price, the only broker carrying on active negotiations with Luther was Scarborough-Miller. Since Kallof had allowed negotiations between Luther and himself to fall through, Kallof had no right to receive a lower price on his listing. The trial court must have found that Hurley knew Taft Kallof had contacted Luther and that Hurley asked Taft Kallof to refrain from further negotiations while the Harris sale was being discussed. Even assuming this, we feel that the trial court misapplied Fink v. Williamson, supra, in the instant case. A broker must be diligent and remain informed of the status of his listing through his own efforts. When he neglects to do this he may not then complain when another broker in a competitive market closes the sale.

For the foregoing reasons, the decision of the court below is reversed with directions to enter judgment for the defendants.

STEVENS, C. J., and DONOFRIO, J., concurring.