428 P.2d 142

**BASS INVESTMENT CO., Inc., an Arizona corporation, Appellant,**

v.

**BANNER REALTY, INC., an Arizona corporation, Appellee.**

**No. I CA–CIV 352.**

Court of Appeals of Arizona.

May 23, 1967.

Rehearing Denied June 21, 1967.

Review Denied Sept. 26, 1967.

Evans, Kitchel & Jenckes, by Joseph S. Jenckes, Jr., Phoenix, for appellant.

Leibsohn, Goldstein & Weeks, by Philip T. Goldstein, Phoenix, for appellee.

CAMERON, Chief Judge.

This is an appeal from a judgment of the trial court finding that the plaintiff below, Banner Realty, Inc., was entitled to a real estate commission from the defendant below, Bass Investment Company, Inc. We are called upon to determine whether or not a sale has taken place and, if so, whether the plaintiff was the procuring or producing cause of said sale.

Viewing the evidence in the light most favorable to the prevailing party in the trial court, Gillespie Land and Irrigation Co. v. Jones, 63 Ariz. 535, 164 P.2d 456 (1945), we find the following facts which are necessary for a proper determination of this matter on appeal. Orville D. Messinger was a real estate salesman and an employee of the plaintiff, Banner Realty, Inc. During Messinger's previous employment as a real estate salesman with another company he had become acquainted with one Frank Hegebeck. Hegebeck had recently returned to Phoenix from Tucson, and Messinger learned that Hegebeck was in the market for a trailer court. Hegebeck told Messinger the amount of money he had for a down payment and what he had in mind. At this time the defendant, Bass Investment Company, Inc., owned the Papago Trailer Park, the subject of this lawsuit. Messinger had

previously negotiated a sale for the property and was familiar with the particulars of its operation. Bass Investment Company, a corporation, also operated through or did business as Bass Realty Company. T. B. Anderson was employed by Bass Investment Company to operate the Bass Realty portion of the operation. Anderson held a real estate broker's license and was described as "the sponsoring broker" of the Bass Realty. Anderson (and Bass Realty Company) shared office space in Phoenix, Arizona, with Bass Investment Company.

Messinger talked with Hegebeck on 22 March 1963, and, upon learning of Hegebeck's interest, Messinger called Aurel D. Bass on the same day asking for a listing for the property. Bass informed Messinger that he should call Robert R. Burks at Bass Investment. Messinger attempted to obtain a listing from Burks, but Burks was too busy to talk until the 28th of March, although on the 26th of March Messinger again drove Hegebeck through the trailer park. On 28 March 1963 Messinger was able to meet with Burks at the office of Bass Investment. Burks first told Messinger that they wanted a net of $175,000, and Messinger testified:

> "And I said, 'I don't want a net listing, Mr. Burks. I want one including a six per cent commission which would be approximately $186,000.' He said, 'That's correct.' I asked him if other brokers had the listing, and he said, 'Yes'. And among them was McCracken Realty. And I said, 'What price do they have?'
>
> "He said, '$186,000 with $20,000 down'."

After some discussion as to the manner in which the commission would be paid, Messinger obtained an open listing for Banner Realty for the park for $186,000. The listing was signed "Bass Investment Co., by R. R. Burks" in the space provided for "Owner". Messinger then went over to Papago Trailer Park with Hegebeck, inspected the trailer park, and proceeded to obtain information concerning the encumbrances and payment schedule in hopes that a sale could be consummated. He met again with the Hegebecks on 2 April to go over the figures and the maturity date of the mortgage, etc. He also met with the Hegebecks on 3 April.

During this time an advertisement was placed in the newspaper which read as follows:

"TRAILER PARK A SENSATIONAL OFFER

"67 space, perfect N. E. location. Completely modern with pool, two bedroom home. Excellent performance record. Can be purchased with $15,000 down and will show an attractive monthly return to the new owner.

Bass Realty

Guarantee Bank Building      266–2453"

Anderson testified that on 2 April Hegebeck called in response to the newspaper advertisement. Anderson quoted the purchase price as $175,000 and made an appointment to see him that afternoon. Testimony of Anderson on this point is as follows:

"Q      And did he ask you anything when you went there that time?

"A      Yes. The first thing Frank said, is this Papago Park, and I said, 'Yes, sir.'

"Q      Then what did he say?

"A      He said Mr. Messinger of Banner showed me that park about a week or two ago.

"Q      So what did you say then?

"A      I said, 'Well, that throws an entirely different light on it.' I didn't know that and I should run back to the office and discuss this with Mr. Burks because I didn't know anybody else had a listing on it."

On 3 April the Hegebecks signed a "Purchase Contract and Receipt" on a printed form with the heading "Bass Realty Company" in which they offered to purchase the property for $175,000, "$5,000.00 by above deposit", $147,800 by assumption of mort-

gage, $10,000 payable $200 a month beginning 1 April 1965, and $12,200 at the close of the sale. The contract contained the provisions:

"VI. That this offer shall be accepted by the Seller on or before ——————. In consideration of the Broker refraining from offering said premises for sale to any other party, the Buyer agrees not to withdraw this offer during said period unless earlier rejected by the Seller. Written notice of acceptance given to the Broker shall be notice to Buyer.

"VII. That if said Buyer shall fail to comply with any of the terms hereof, the Seller at his option may demand specific performance of this Contract, or may retain the amount paid herein as liquidated damages.

\* \* \* \* \* \* \* \* \* \*

"IX. That this deposit is accepted subject to prior sale, and subject to acceptance by Seller.

By /s/ T. B. Anderson

"ACCEPTED:

/s/ Frank A. Hegebeck     Address: _____
     Purchaser

/s/ Margaret Hegebeck     Phone: _____
Purchaser (wife or husband)

"I (or we) agree to sell the above described property on the terms and conditions herein stated and agree to pay the above signed Broker as fee the sum of _____ DOLLARS ($_____), or one-half (½) the deposit in case same is forfeited by the purchaser, provided same shall not exceed the full amount of the fee.

"DATED: _____, 19___

_____Address: _____
     Seller

_____Phone: _____ "
  Seller (wife or husband)

———◆———

Messinger was unable to contact Hegebeck after this and wrote Bass Realty stating that he had shown the property to Hegebeck and to another party and they were his (Banner's) prospects. Messinger was able to contact the Hegebecks on 10 April when he met with them for 45 minutes. Messinger and Simmons, the manager of Banner Realty, met with Burks on 11 April and they requested a commission. Messinger's testimony is:

"And he said, 'No, it's not.' He says, 'It's not.' He said, 'Mr. Anderson agreed to handle this for $1,800, and now he has agreed to handle this for $1,300 and give you $500 commission.' And Mr. Simmons say, 'Well, I'm shocked. This is not the agreement at all, and we wouldn't accept $500'."

Suit was filed 11 April 1963 asking for a commission of $10,500, and the property was attached.

Trial was held, commencing 15 September 1965, and findings of fact and conclusions of law were requested. Mr. and Mrs. Hegebeck, the alleged purchasers, did not testify. The testimony of Burks, Bass and Anderson, as well as the bookkeeper for Bass Investment Co. (Raymond J. Brown), and also the new owner of Bass Investment (Rene Larriva), indicated that Mr. and Mrs. Hegebeck entered into negotiations for the pur-

chase of the property and that they signed the "Purchase Contract and Receipt" as indicated, but that the seller, Bass Investment Company, never executed the agreement through its agents. It is the contention of Banner, and the court so found:

"That the execution by Mr. T. B. Anderson of Exhibit No. 7 in evidence was at the direction of Mr. Robert Burks, as Secretary-Treasurer and member of the Board of Directors of Defendant BASS INVESTMENT COMPANY, INC., and said exhibit was executed by Mr. T. B. Anderson as agent of Defendant, Bass Investment Company, Inc., and that the signing of said Exhibit by Mr. T. B. Anderson constituted an acceptance on behalf of Defendant of the offer to purchase from Mr. and Mrs. Hegebeck."

The testimony of Aurel D. Bass is contrary:

"Q Prior to April 11, 1963, were you aware that the Hegebecks had made an offer to Bass Investment Company to purchase the Papago Trailer Park?

"A No.

"Q Did you learn later on that an offer had been made?

"A Yes.

"Q When did you learn it?

"A I couldn't answer that. I don't know what the date was.

"Q Well, was it some weeks or months after that?

"A Possibly a week, two weeks. We were out of town, and when we got back in why that's when we had a meeting where I was advised of it.

"Q I see. Did you as president of the Bass Investment Company after you learned that Hegebecks had made an offer, did you in any way accept that offer on behalf of Bass Investment Company?

"Mr. Goldstein: Same objection.

"A No, sir."

The court found that the Hegebecks had paid Bass Investment Co. the sum of $5,000

as and for earnest money on 4 April 1963, and, thereafter, on 26 July had paid the sum of $12,000 to Bass Investment Company. The trial court also found that Robert R. Burks was given authority from the members of the Board of Directors to sell the park without the necessity of attaining approval of the Board of Directors. The trial court also found that T. B. Anderson, when he executed the purchase contract and receipt, did so at the direction of Robert Burks, Secretary-Treasurer of Bass Investment Company.

■ It is the testimony of the agents for the defendant Bass Investment Company (1) that even though the Hegebecks admittedly offered to purchase the property, the offer was never accepted, (2) in response to the inferences that Hegebeck actually took possession of the property, quite the contrary was true and Hegebeck worked as a laborer on the premises after the transaction, and (3) the amount of $17,-000 received because the sale did not go through was converted to a loan with 6% interest. A promissory note and agreement in the amount of $17,000 payable by Bass Investment Company, Inc. to Frank Hegebeck and bearing 6% interest with monthly installments in the amount of $340 was admitted in evidence. The trial court evidently viewed this testimony with suspicion, and we have no reason to believe that suspicion was unjustified:

"The findings of a trial court are binding on the Supreme Court if the evidence is such that it reasonably sustains them. (citations omitted) It is true that the evidence is perhaps conflicting, but the lower court heard the witnesses and had an opportunity to judge the credibility of the witnesses." Gillespie Land and Irrigation Company v. Jones, 63 Ariz. 535, 164 P.2d 456, supra. See also Rule 52(a), Rules of Civil Procedure, 16 A.R.S.

We would agree with the court below that, given a sale of the property, the evidence was sufficient from which the court could find that Messinger of Banner Realty was

the efficient procuring cause of the sale of the property from Bass Investment to Hegebeck, and we would agree with appellee that the action of the agents of Bass in offering the property for sale at a lesser price does not excuse them from paying a commission if, in fact, a sale is consummated. As has been stated by our Supreme Court:

> " 'An agent employed to sell real estate, who first brings it to the notice of the person who ultimately becomes the purchaser, is entitled to his commissions on the sale, although the latter is effected by the owner of the property, nor can the owner evade his liability to pay the agent his commissions by selling for a sum less than the price given the agent, when the reduction is made of the owner's own accord.' " Fink v. Williamson, 62 Ariz. 379, 158 P.2d 159 (1945), quoting from Fornara v. Wolpe, 26 Ariz. 383, 226 P. 203 (1924).

Appellee cites our Court, Division Two, as follows:

> "Generally speaking, a real estate broker has earned his commission when he has brought to the vendor a purchaser who is ready, willing and able to buy the property on the terms authorized or any terms acceptable to the seller, when the seller has entered into a written contract with a purchaser produced by the broker. (citations omitted) It is not a condition precedent to payment of commission, under the foregoing rule, that the sale be consummated." Bradley v. Westerfield, 1 Ariz.App. 319, 321, 402 P.2d 577 (1965).

The case before this Court, however, may be distinguished from *Bradley*, op. cit., in that the seller in *Bradley* warranted marketable title, and, after an agreement on the sale, the seller was unable to deliver marketable title. We believe the law in Arizona is clear that in order for a realtor to be entitled to a commission he must show facts sufficient to prove, (1) a sale (or a binding agreement for sale, *Bradley*, supra), and (2) that he was the procuring cause of that sale. Porter v. Ploughe, 77 Ariz. 33, 266 P.2d 749 (1954), Clark v. Ellsworth, 66 Ariz. 119, 184 P.2d 821 (1947), Fink v. Williamson, 62 Ariz. 379, 158 P.2d 159 (1945), Hurley v. Kalloff, 2 Ariz.App. 446, 409 P.2d 730 (1966), and Elerick v. Rocklin, 102 Ariz. 78, 425 P.2d 103 (1967).

 In the instant case, under the evidence as found, the Hegebecks could not enforce a suit for specific performance of the "Purchase Contract and Receipt". Even though T. B. Anderson and Robert R. Burks had the authority to sell the property, they did not indicate by proper actions that they elected to bind Bass Investment Company to the sale of the property. There was no clear and unequivocal acceptance by the seller which would bind the seller to the contract.

We do not believe that the plaintiff has shown that a sale took place. It is immaterial that T. B. Anderson was acting as broker or agent of Bass Investment Company as seller or that Burks could sell without prior permission of the Board of Directors or that he could authorize T. B. Anderson to so do. The contract in evidence does not show that Bass Investment was bound to the sale of the property. The "contract" itself is in the name of Bass Realty Company, not a corporate entity, through which Bass Investment Company was doing business.

Neither are we able to find that the evidence supports a sale by the subsequent actions of the party. We have no doubt that Hegebeck intended to purchase the property, but his offer was not accepted as it must have been to support a real estate commission.

It may well be that the attachment of the property in question successfully prevented the sale from being consummated. This issue has not been raised before this Court, and we can certainly agree with the trial court in its disapproval of defendant's actions in the instant case. We do not, however, believe that a sale has been

shown, and the matter therefore must be reversed.

STEVENS, J., and LAURENS L. HENDERSON, Judge of Superior Court, concur.

NOTE: Judge FRANCIS J. DONOFRIO having requested that he be relieved from consideration of this matter Judge LAURENS L. HENDERSON was called to sit in his stead and participate in the determination of this decision.