436 P.2d 894

**BASS INVESTMENT CO., Inc., an Arizona corporation, Appellant,**

**v.**

**BANNER REALTY, INC., an Arizona corporation, Appellee.**

**No. 9056–PR.**

Supreme Court of Arizona.

In Banc.

Feb. 8, 1968.

Rehearing Denied March 5, 1968.

Evans, Kitchel & Jenckes, by Joseph S. Jenckes, Jr., Phoenix, for appellant.

Leibsohn, Goldstein & Weeks, by Philip T. Goldstein, Phoenix, for appellee.

McFARLAND, Chief Justice:

This case is before us on a petition for review of a decision of the Court of Appeals in case number CA-1-CIV 352, 5 Ariz.App. 478, 428 P.2d 142, reversing a judgment of the Superior Court in favor of plaintiff-appellee. The decision of the Court of Appeals is vacated.

Plaintiff-appellee Banner Realty, Inc., hereinafter called Banner, sued defendant-appellant Bass Investment Co., Inc., hereinafter called Bass, to collect a real-estate commission. The trial judge, sitting without a jury, found for plaintiff and entered judgment in its favor.

O. D. Messinger, an employee of Banner, was acquainted with Frank Hegebeck, a prospective buyer for a trailer park. On March 22, 1963, Messinger commenced a series of telephone calls to Bass for the purpose of getting an appointment to obtain a listing for Papago Trailer Park owned by Bass. On March 28 he obtained a written open (non-exclusive) listing from R. R. Burks, stockholder, director, secre-tary-treasurer, and man-in-charge of Bass Investment Co. The selling price in the listing was $186,000. Burks advised Messinger that the park was listed with Mc-Cracken Realty Co. for the same price, and that one T. N. Anderson, a real estate broker in Bass's realty division was also attempting to sell the park. The commission for the sale was to be six per cent ($11,160), which would leave Bass with a net amount of $174,840.

During the next few days Messinger engaged in an intensive effort to sell the park to Hegebeck. There were repeated meetings and discussions, and inspections of the grounds. Whether these efforts would have been successful will never be known because Bass's employee Anderson advertised the park in the newspaper, causing Hedgebeck to contact him on April 2d to ask the price. On being told the price was $175,000, Hegebeck expressed interest, and Anderson made an appointment for that afternoon to discuss the matter. The advertisement did not specifically mention the location of the park, but when the men met, Anderson revealed that the advertisement referred to Papago Trailer Park. Hegebeck immediately told him that Messinger, of Banner Realty, had shown him the park one week earlier. Anderson expressed surprise, stated that he did not know that any one else had the listing, and that he would have to consult Burks before proceeding further. He went back to the office where he told Burks of the new development, and Burks said that Messinger "did not follow through," but that he would give him "some consideration" anyway, and told Anderson to go ahead with his attempt to interest Hegebeck. On April 3d, Anderson brought Hegebeck and his wife to Burks's office and in Burks's presence filled in a form entitled "Purchase Contract and Receipt," a copy of which appears here. It was conceded that Anderson executed the instrument at the direction, and in the presence, of Burks.

# Bass Realty Company

ROOM 324 ∴ 3550 NORTH CENTRAL AVENUE • PHONE 266-2453 • PHOENIX 12, ARIZONA

## PURCHASE CONTRACT AND RECEIPT

Phoenix, Arizona, *April 3*, 1963

RECEIVED FROM *Mr. Frank A. Hegebeck + Wife Margart*
the sum of *Five Thousand + 00/XX* DOLLARS ($ *5000.00/XX* )
as earnest money and part purchase price of the following described property, situated in the County of *Maricopa* State of Arizona:
*Papago Trailer Courte 2338 E McDowell Rd.*

which the Buyer agrees to purchase for the full purchase price of *One Hundred Seventy Five Thousand + 00/XX* DOLLARS ($ *175,000.00/XX* ), payable as follows:

$ *5000.00* by above deposit
$ *147,800.00* *Assume by buyer, subject to Credit.*
$ *12,200.00* *at close of sale*
$ *10,000.00* *Payable at 200.00 Per Month Beginning April 1, 1965-6*

*175,000.* ( SUBJECT TO REVIEW and APPROVAL of
BOOKS OR STATEMENT *Frank A. Hegebeck*
Vecived and approved on 4-4-63 *Margaret Hegebeck* )

with interest on deferred payments at the rate of.............per cent (...........%) per annum, from.....
.................................................................... Payable .....................................................................

The unpaid balance of any mortgage or agreement for sale mentioned herein is approximate. Any difference shall be reflected in the deferred balance to be paid the Seller so that the full purchase price will be as stated.

IT IS HEREBY AGREED:

I. That the following items shall be prorated in the following manner:
1. Taxes *Prorate close of sale*
2. Paving
3. Irrigation Assessments
4. Interest *Prorate close of sale.*
5. Insurance
6. Rents *Prorate close of sale*
7. Other Special Assessments

Possession shall be delivered *close of sale*

II. That title to said premises shall be conveyed by a Warranty Deed subject to the conditions of this Contract, free from incumbrances except:
1. Rights reserved in patents
2. Building, use, and other restrictive covenants of record.
3. Zoning regulations of any governmental agency
4. Easements and rights of way for roadways, canals, laterals, ditches and public utilities over and across the property.
5. Taxes, paving, irrigation or other special assessments not now delinquent.
6. Other incumbrances as follows:

and evidenced by a Title Insurance Policy issued by a duly qualified Title Insurance Company, insuring the Buyer in the full amount of the purchase price shown herein, to be paid for by the Seller, in form now in use, subject to the usual exception therein contained and to the matters set forth above.

III. That if the title to the above property be defective, ninety (90) days from the date hereof will be given the Seller, to perfect the same. If said title cannot be perfected within said time the earnest money receipted for herein shall at the option of the Buyer, and upon his demand, be returned to the Buyer and this contract cancelled.

IV. That the Buyer and Seller, within ten (10) days of acceptance of this offer, shall execute escrow instructions to the Title Insurer as escrow agent to carry out the terms hereof; the earnest money and all other funds and documents necessary to complete the same as herein provided shall be deposited in said escrow; and the Buyer and Seller shall each pay one-half (½) of the escrow fee, and all other costs properly chargeable to each in accordance with the prevailing custom.

V. That the Buyer has investigated the said premises and the Broker and the Seller are hereby released from all responsibility regarding the valuation thereof, and neither Buyer, Seller nor Broker shall be bound by any understanding, agreement, promise, or representation, express or implied, not specified herein.

VI. That this offer shall be accepted by the Seller on or before.......................................... In consideration of the Broker refraining from offering said premises for sale to any other party, the Buyer agrees not to withdraw this offer during said period unless earlier rejected by the Seller. Written notice of acceptance given to the Broker shall be notice to Buyer.

VII. That if said Buyer shall fail to comply with any of the terms hereof, the Seller at his option may demand specific performance of this Contract, or may retain the amount paid herein as liquidated damages.

VIII. That time is the essence of this contract.

IX. That this deposit is accepted subject to prior sale, and subject to acceptance by Seller.

ACCEPTED:

By *J B Anderson*

*× Frank A. Hegebeck*
Purchaser ..................................................Address:.....................................................

*× Margaret Hegebeck*
Purchaser (wife or husband) ..................................................Phone:.....................................................

I (or we) agree to sell the above described property on the terms and conditions herein stated and agree to pay the above signed Broker as fee the sum of.............................................................................................................
DOLLARS ($...........................................), or one-half (½) the deposit in case same is forfeited by the purchaser, provided same shall not exceed the full amount of the fee.

DATED:..................................................., 19....................

..................................................Address:.....................................................
Seller

..................................................Phone:.....................................................
Seller (wife or husband)

— 3 —

On April 1st Messinger mailed to Burks a notice that he was dealing with Hegebeck on the park, as Burks had previously told him that he would protect Messinger on his commission with respect to prospects of whom he had notice. Burks admitted receiving the notice, and admitted that he knew about Hegebeck's connection with Messinger before the "contract" was executed.

Messinger was unable to contact Hegebeck until April 10th, at which time he learned that Anderson had offered the property to Hegebeck for $175,000. He told Hegebeck that he would contact Bass and try to get the property for less than the $186,000 which he had previously quoted. On April 11th Messinger and his broker Harry Simmons went to see Burks who told them that no sale had been made, and that, if they would accept $500 for their commission, the sale could be completed, but that he could not sell for $175,000 and pay the full commission. Banner then started this action for the full commission, and attached the park, making it nearly impossible to complete the sale. On July 26th Hegebeck paid another $12,000 to Bass and either took possession of, or worked around, the park in the hope that he would soon own it.

About a year prior to the above events, Bass had held a meeting of its board of directors and passed a resolution authorizing Burks to execute "any and all documents pertaining to the operation of the Bass Investment Company, Inc."

■ We think that two principles of law relating to real-estate commissions are undisputed: (1) If a licensed real estate salesman has a listing for a piece of property, and brings to the owner a buyer ready, willing, and able to pay the price at which the property is listed, he has earned his commission, regardless of whether the owner sells or refuses to sell, and (2) If such salesman brings to the owner a buyer who is willing and able to buy at a price below the listed price, the commission is earned if, but only if, the owner

actually sells the property or is willing to sell to that buyer. Lockett v. Drake, 43 Ariz. 357, 31 P.2d 499; Fink v. Williamson, 62 Ariz. 379, 158 P.2d 159; Tucker v. Green, 96 Ariz. 371, 396 P.2d 1.

In Fornara v. Wolpe, 26 Ariz. 383, 226 P. 203, we said:

" * * * While the pleading and proof are that appellee was given certain terms upon which the property would be leased, yet, if he brought it to the notice of the person who afterwards purchased it, the fact that the owners themselves consummated the deal and voluntarily took a less sum than that given appellee would not deprive the latter of his right to the commission. * * *"

The only issue involved here is whether a sale was made. The answer depends upon the voluminous and contradictory facts of the case, and upon the proper interpretation of the "contract." That document is a living monument to the type of problems that may be expected when a layman attempts to prepare a legal document. Bass contends that the document is merely an offer coupled with a receipt for the earnest money and never accepted by Bass.

■ If this document is an offer, it is the first offer that has ever come to our attention that is couched in words of acceptance! We have never seen a man make what he thought was an offer, by writing "accepted," followed by his signature. He would hardly write to a seller, "I agree to purchase your property for $175,000—I accept." We can only conclude that Hegebeck acted in good faith and signed what he thought was an acceptance of Bass's offer. The written page contained all of the terms—price, description, time and manner of payment, etc. It was signed by Bass's employee at the direction of Bass's corporate secretary acting under the authority of a resolution of the corporation's board of directors.

Bass was guilty of continued bad faith toward both Banner and Hegebeck. Burks admitted that he had notice that Hegebeck was Banner's prospect, before the contract

was prepared. Anderson was so notified at his first meeting with Hegebeck. Upon receiving this information, good faith required that Hegebeck be told immediately that the offer to sell for $175,000 was made upon the impression that Hegebeck had not previously been dealing with Messinger, and that the offer, therefore, could not stand unless and until satisfactory arrangements could be made reducing the commission so that Bass would realize $175,000 net. Good faith also required that Messinger be notified immediately of the events, and be permitted to be present at all future negotiations.

Hegebeck was not a witness, so we cannot know precisely what he was told. Bass's bookkeeper testified that he made all the bookkeeping entries in Bass's books, only in accordance with directions from Burks. Pages from the ledger were introduced, and indicate that the $5,000 and $12,000 payments were immediately credited to "advances to officers." Later that year, Burks directed that the entries be changed by debiting "advances to officers" and crediting "advance deposits—sale of Papago."

It also appears that in 1963 Hegebeck got tired of waiting for the deal to be consummated and requested the return of the $17,000. Bass had used the money in its business, and didn't have it available. Finally, on May 13, 1964, instead of refunding the money, Bass gave Hegebeck a promissory note for that amount, payable at the rate of $340 per month. The note, incidentally, is another example of the work of a lay-draftsman. It is the first note ever to come to our attention with a jurat under the maker's signature!

Obviously Bass wanted to have his cake and eat it too. In dealing with Hegebeck it was obviously trying to hold a live prospect in the hopes that Banner would compromise the commission and thus enable Bass to dispose of the property at a satisfactory price, while at the same time taking the position with Banner that no sale had been made. The fair thing to have done was to tell Hegebeck that there was

no deal. To do this, however, would mean that Bass would have to refund the money to Hegebeck. Had the money been kept in a separate trust account, as it should have been, a refund would have been possible. Whether or not the "contract" is construed as giving rise to a sale depends not only upon its terms but also upon the surrounding events and the light they throw upon the intention of the parties. Even though the seller may not have intended to sell, he may have so acted as to cause Hegebeck to believe that he was offering to sell the property.

There is much conflict in the testimony. For example, the following examination of Messinger:

"Q Now in connection with the conversation which you had with Burks in his office where Mr. Simmons was present did Mr. Burks tell you that the Papago Trailer park had been sold to the Hegebecks?

"A Yes.

"Q Did he say that they were going to sell it * * * or did he say that a sale had been made?

"A He said it was sold."

when compared to the following testimony of Burks as to what was said at the same meeting:

"I told them that we had an offer * * *

I told them that we hadn't accepted the offer. I did not tell them that a sale had been made."

█ █ It would serve no useful purpose to continue detailing the evidence. This case illustrates why this court will not upset a trial court's findings of fact where there is evidence from which a reasonable man could draw the same conclusions. The trial court saw and heard the witnesses and made extensive findings of fact, including findings that Hegebeck's offer was accepted and a sale was made during the period in which Banner's listing was in full force and effect. It is undisputed that Banner's man was the first person to introduce Hegebeck to the property, so that Bass's argu-

ment that Banner did not introduce Hege-beck to the owner is completely irrelevant. The court's findings also included one to the effect that Bass acted in bad faith.

 If a sale was made, the commission was earned at the time it was made, and could not be lost by reason of the seller's refusal to honor the agreement. Lockett v. Drake, 43 Ariz. 357, 31 P.2d 499. In view of the contract, it would make no difference whether the contract was in writing or not. An oral contract to sell land may be enforceable unless one party sets up the Statute of Frauds as an affirmative defense. If, having the buyer's signature on an enforceable contract, the seller refuses to perform, even though he may successfully plead the Statute of Frauds, this cannot affect his liability for an earned commission. In the instant case, however, with Anderson's signature on the written contract, Bass would be unable to invoke the Statute, so that the questions raised as to whether Hegebeck took possession are also irrelevant.

The decision of the Court of Appeals is vacated, and the judgment of the Superior Court is affirmed.

UDALL, V. C. J., and STRUCKMEYER, BERNSTEIN and LOCKWOOD, JJ., concur.